J-S32022-18 & J-S32023-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF: J.M.T., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: O.L.T., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 198 MDA 2018 |

Appeal from the Order Entered January 5, 2018
In the Court of Common Pleas of York County Juvenile Division at No(s):
CP-67-DP-0000131-2016

| | | |
|---|---|---|
| IN RE: ADOPTION OF: J.M.T., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: O.L.T., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 199 MDA 2018 |

Appeal from the Order Entered January 5, 2018
In the Court of Common Pleas of York County Juvenile Division at No(s):
CP-67-DP-0000132-2016

BEFORE:    PANELLA, J., NICHOLS, J., and PLATT*, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED SEPTEMBER 11, 2018**

O.L.T. (Mother)[1] appeals from the orders granting the petitions filed by

the York County Office of Children, Youth and Families (CYF) to change the

_____

* Retired Senior Judge assigned to the Superior Court.

[1] At all times relevant to this appeal, L.A.T. (Father) was incarcerated at the Somerset State Correctional Institution in relation to his guilty pleas to

permanency goals regarding her minor, male twin children, Ji.M.T. and Jr.M.T. (born in June of 2012) (collectively, Children), to adoption.[2]  We affirm.

The factual and procedural history of this appeal is as follows.  On April 28, 2016, CYF received allegations that Mother left Children without supervision.  The York City Police Department responded to Mother's residence and found Children alone.  Mother returned to the residence twenty minutes later and smelled of alcohol.  Mother was incarcerated on April 28, 2016, for endangering Children's welfare.  Mother's cousin, R.M. (Foster Mother), came forward as a resource for Children and was approved as an emergency caregiver.

On April 29, 2016, the Agency filed applications for emergency protective custody.  Attorney Thomas L. Kearney, IV, was the court-appointed guardian *ad litem* (GAL) for Children.  In orders for emergency protective custody dated April 29, 2016, the trial court concluded that there was

---

possession of a firearm prohibited, a second-degree felony, and burglary of an overnight accommodation with a person present, a first-degree felony. Father did not appeal the trial court's orders.

[2] As the trial court explained, since Children have the same initials, they were designated as Ji.M.T. and Jr.M.T. in the respective petitions.  Trial Ct. Op., 2/16/18, at 1.  We have consolidated Mother's appeals from the orders changing Children's permanency goal to adoption for the purposes of disposition.

The trial court also terminated Mother's parental rights.  Mother's appeal from those decrees are listed at 202 & 203 MDA 2018 and are addressed in a separate memorandum.

sufficient evidence to prove that continuation or return of the minor children to Mother's home was not in the best interest of Children. The trial court temporarily awarded legal and physical custody of Children to the Agency, and Children were placed with Foster Mother.

On May 4, 2016, the Agency filed dependency petitions. The following day, Mother was released from prison, and began having unsupervised contact with Children. Justice Works opened for services with Mother on May 17, 2016. On May 31, 2016, a first family service plan (FSP) was prepared for Mother, which permitted unsupervised visitation at Mother's home.

On June 20, 2016, a CYF caseworker made a field visit to Mother's residence and found Children outside and unsupervised. The caseworker repeatedly knocked on Mother's door. Mother did not answer the door for approximately fifteen minutes. After that incident, Mother's visits with Children were changed to visits supervised by Foster Mother.

On July 19, 2016, the trial court adjudicated Children dependent under 42 Pa.C.S. § 6302(1). The court maintained legal and physical custody with the Agency and ordered Children to remain in kinship care. The permanency goal was return to a parent or guardian, with a concurrent goal of adoption. On September 20, 2016, Justice Works closed services as unsuccessful without reunification being accomplished.

In a permanency review order dated October 5, 2016, the trial court found Mother had made minimal compliance with the permanency plan and

toward alleviating the circumstances that necessitated the original placement. The court found that the Agency had made reasonable efforts to finalize the permanency plan. The court further found a continued need for placement of Children outside of the care and custody of Mother and retained legal and physical custody of Children with the Agency.

In a permanency review order dated March 28, 2017, the trial court found that Mother had made minimal compliance with the permanency plan, and she had not made any progress toward alleviating the circumstances that necessitated the original placement. The court found that the Agency had made reasonable efforts to finalize the permanency plan. The court found a continued need for placement of Children outside Mother's care and custody, and maintained legal and physical custody with the Agency.

According to Foster Mother, there was an agreed-upon specific visitation schedule, but Foster Mother had "an open door policy" in which Mother could request additional visits, and Foster Mother would accommodate her. Mother would frequently not appear for the scheduled visits, but would arrive at her home for visits at 9:00 p.m. Foster Mother reported Mother's visits being too late at night to CYF. As of January of 2017, Mother had appeared for four of the thirty-one scheduled visits. Mother would not call to cancel visits and she would just not appear for the scheduled visitation time. Mother asked Foster Mother to lie about the number of visitations Mother missed.

Mother and Foster Mother's relationship began to break down, and it was decided that CYF would supervise visits at its office. However, there was a delay of approximately one month, until July 20, 2017, for the scheduling of the visits at CYF to be arranged with Foster Mother and Mother.

On August 29, 2017, CYF filed petitions seeking a goal change to adoption under 42 Pa.C.S. § 6351. That same day, CYF filed petitions to involuntarily terminate the parental rights of Mother and change Children's permanency goal to adoption under 23 Pa.C.S. § 2511(a)(1), (8), and (b).

In a permanency review order dated September 18, 2017, the trial court found that Mother had made moderate compliance with the permanency plan, and she had made moderate progress toward alleviating the circumstances that necessitated the original placement. The trial court found that the Agency had made reasonable efforts to finalize the permanency plan. The trial court also found a continued need for placement of Children outside the care and custody of Mother, and maintained legal and physical custody with the Agency.

At the directive of the trial court, CYF made a referral to a Pressley Ridge Family Engagement Team (PRFET) on September 18, 2017. *Id.* The PRFET received a referral from the Agency on September 20, 2017, to provide supervised visitation between Mother and Children for an hour to an hour and a half, one time per week. Mother complied with the visitation schedule, often arriving early for the visits, although Foster Mother usually was late in bringing Children to the facility. Mother did not miss a visitation at Pressley Ridge.

However, on November 17, 2017, Mother had a community visit with Children to celebrate the birthday of Mother's granddaughter.[3] Mother told a Pressley Ridge family engagement specialist, Carla Arp, that the birthday party would be held at a "Sky Zone"[4] in Lancaster. However, the party was held at the Sky Zone in Mechanicsburg. Ms. Arp, who was assigned to supervise the visit, first went to the Sky Zone in Lancaster, but then had to travel to the Mechanicsburg location. Mother traveled from York to Mechanicsburg in her daughter's car with her daughter, her granddaughter, and the Children, without proper car seat restraints for one of the Children. A Childline report for the incident was submitted after Foster Mother discovered that Mother had not properly secured one of the Children in a child seat.

The PRFET prepared an evaluation that same evening. The PRFET rated as poor Mother's initiation and engagement in appropriate interaction with the Children, her ability to provide an appropriate level of supervision, her ability to prepare or purchase appropriate snacks, and her ability to demonstrate an awareness of an appropriate schedule or routine. The PRFET also categorized Mother's demonstration of an interest in the Children's well-being and awareness of the Children's needs as very poor. Further, the PRFET described Mother's ability to recognize and effectively react to potentially dangerous

---

[3] Mother has an an adult daughter, S.B., who has a daughter of her own.

[4] Sky Zone is an indoor trampoline facility.

situations as poor or very poor. The caseworkers suggested that Mother not have further community visits with the Children.

Foster Mother also forwarded to CYF a video of Mother taken around Halloween in 2017. At that time, Mother went to Baltimore for a Halloween party, and admitted in the video that she was drinking Hennessy.

Throughout the time Children were removed from her care, Mother participated in drug and alcohol testing through Families United Network. She submitted to random drug and alcohol screenings and never had a positive test result. Mother never refused to provide a specimen nor was unable to provide a specimen. However, on twenty-six occasions, Mother was unavailable to be tested.

Mother has not met Children's teachers or taken steps to meet Children's educational needs.[5] Mother also failed to attend Children's dental surgeries, about which Mother had been notified, and did not know the name of Children's doctors. There was no evidence that Mother would contact the Children outside of her regularly-scheduled visitation, or that she would have regular phone contact with the Children.

Children still regard Mother as their mother, call her "Mommy," and are bonded to her. Children also demonstrate a parental bond to Foster Mother,

---

[5] Children have individual educational plans (IEPs) and participate in speech therapy.

as she meets their daily and regular needs since their initial placement, and refer to her as "Nam-maw." Children have a bond with each other.

On December 15, 28, and 29, 2017, the trial court conducted an evidentiary hearing on the petitions. Mother and her counsel were present. Children were present and were represented by Attorney Kearney as their GAL and legal counsel.[6]

At the hearing, Mother testified on her own behalf. Mother denied leaving Children unsupervised during the June 20, 2016 incident before Children were found dependent. She suggested that Children were not

_____

[6] Section 6311 of the Juvenile Act requires a trial court to appoint an attorney as GAL "to represent the legal interests and the best interests of the child" throughout a dependency proceeding. 42 Pa.C.S. § 6311(a). The comments to the Pennsylvania Rules of Juvenile Court Procedure further provide that if there is conflict of interest in discharging those duties, the GAL "may move the court for appointment as legal counsel and assignment of a separate guardian ad litem." Pa.R.J.C.P. 1154 cmt.

We acknowledge that the appointment of legal counsel in a contested proceeding to terminate parental rights proceeding is mandatory. **See** 23 Pa.C.S. § 2313(a); **In re Adoption of L.B.M.**, 161 A.3d 172, 174 (Pa. 2017). We further note that when reviewing termination proceedings, this Court has raised *sua sponte* issues related to the appointment of legal counsel for a child. **See In re Adoption of T.M.L.M.**, 184 A.3d 585, 588 (Pa. Super. 2018).

However, given the differences in the role of the GAL envisioned in Section 6311 and 2313, we decline to consider *sua sponte* whether the GAL had a conflict of interest when representing Children's legal and best interests as required by Section 6311(a). Nevertheless, we remind counsel of their duties to ascertain and avoid conflicts of interests in dependency proceedings, **see** Pa.R.J.C.P. 1154 cmt., particularly where bonds between a parent and a child exist.

outside, but watching television while she was cleaning the kitchen. She further stated that she did not hear the caseworker knocking at the door because she was playing music loudly.

Mother explained that her relationship with Foster Mother broke down because Foster Mother was working against Mother and Mother's reunification with Children. Mother stated she was concerned that Foster Mother was not feeding Children enough and not spending money on Children for their haircuts and clothes. Mother asserted that she purchased new clothes for Children, but that she did not see them wearing the new clothes.

Mother also explained that she did drink alcohol but that she did not have a problem with alcohol. She admitted that in the Halloween video she was drinking a Hennessy slushy, but that she only had that one drink that night. Mother blamed Foster Mother for disclosing the video to CYF.

The trial court, on December 29, 2017, found that it was appropriate to change Children's permanency goal to adoption. The orders changing the permanency goal were entered January 5, 2018.

On January 29, 2018, Mother timely filed notices of appeal, along with concise statements of errors complained of on appeal, with the trial court. The trial court filed an opinion relying on its oral ruling at the hearing.

Mother raises the following issue with regard to the goal change as to each of Children:

> Whether the trial court erred in changing the goal of this case from
> return to parent or guardian to placem[e]nt for adoption[?]

Mother's Brief at 4.

Mother argues that that she was compliant with the family plans to resume her parental obligations and responsibilities. *Id.* at 15. She emphasizes that Foster Mother hindered her efforts at reunification at critical junctures of the case. *Id.* Mother further contends that the trial court failed to consider the best interests of Children because changing the goal to adoption served only to sever the "very obvious and strong bond between Mother and . . . Children." *Id.* at 32.

> Our standard of review in a dependency case follows:
>
> "[T]he standard of review in dependency cases requires an appellate court to accept findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law." We review for abuse of discretion[.]

*In re L.Z.*, 111 A.3d 1164, 1174 (Pa. 2015) (citation omitted).

Regarding the disposition of a dependent child, subsections 6351(e), (f), (f.1), and (g) of the Juvenile Act provides the trial court with the criteria for its permanency plan for the subject child. *See* 42 Pa.C.S. § 6351. Pursuant to those subsections of the Juvenile Act, the trial court is to determine the disposition that is best suited to the safety, protection and physical, mental and moral welfare of the child.

When considering a petition for goal change for a dependent child, the trial court considers:

the continuing necessity for and appropriateness of the placement; the extent of compliance with the service plan developed for the child; the extent of progress made towards alleviating the circumstances which necessitated the original placement; the appropriateness and feasibility of the current placement goal for the child; and, a likely date by which the goal for the child might be achieved.

*In re A.K.*, 936 A.2d 528, 533 (Pa. Super. 2007) (citing 42 Pa.C.S. § 6351(f)).

Additionally, Section 6351(f.1) requires the trial court to make a determination regarding the child's placement goal:

> **(f.1) Additional determination.—**Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:
>
> * * *
>
> (2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S. § 6351(f.1).

On the issue of a goal change, this Court has stated:

> When a child is adjudicated dependent, the child's proper placement turns on what is in the child's best interest, not on what the parent wants or which goals the parent has achieved. Moreover, although preserving the unity of the family is a purpose of the [Juvenile] Act, another purpose is to "provide for the care, protection, safety, and wholesome mental and physical development of children coming within the provisions of this chapter." 42 Pa.C.S. § 6301(b)(1.1). Indeed, "[t]he relationship of parent and child is a status and not a property right, and one in which the state has an interest to protect the best interest of the child."

*In re K.C.*, 903 A.2d 12, 14-15 (Pa. Super. 2006) (some citations omitted).

Instantly, the trial court made the following relevant findings:

In this case, the [c]ourt commends Mother's counsel for pointing out the things that Mother has done, and that is what makes this case particularly difficult. The problem is that the things that she has done have not made up for the things that she has not done.

She has not played an active role in their dental care, including surgery. She has not played an active role in meeting their special needs, particularly speech therapy. She has not played an active role in their educational needs, specifically participation in IEP's and keeping track of what's going on with them at school.

Additionally, the [c]ourt is disturbed by the fact that she has been looking for a scapegoat and has not really been stepping up. It seems to be about minimizing her behavior and placing blame.

This case started when Mother left three-year-olds unsupervised for an extended period of time that required police involvement. She then followed up [in June of 2016], and even if the [c]ourt takes her at her word, regardless of the prior findings of fact, with three-year-old boys, she put them in front of a television, and then left them to listen to music where she couldn't even hear what was going on with them, [sic] and the caseworker was attempting to get her attention in excess of 15 minutes during a period of time that [she knew] these boys [were] unsupervised or that she should have known that they were unsupervised.

While she may have had issues with [Foster Mother] supervising her visits, that was not an excuse to fail to call or to fail to show for visits where her boys were expecting to see her.

The [c]ourt does not find that [Foster Mother's] behavior at any time was inappropriate, and in fact, she was following her responsibilities as a supervisor. It is not appropriate to visit with four-year-old boys at 9:00 o'clock at night. That is not a quality visit, and she was right in indicating that to Mother.

While the [c]ourt understands that Mother has been working, the [c]ourt notes that this employment has not been with a consistent employer in prior court Orders.

* * *

- 12 -

As was noted by the Agency, Mother's visits are still supervised.

At the time of the September hearing, Mother had been compliant and has been compliant, but there is a difference between compliance and progress. September was the first time that Mother had shown any significant progress in this case, and the [c]ourt gave her an opportunity to move to unsupervised visits.

While the [c]ourt would have liked to have seen more visits, what is striking was the one time Mother was given an opportunity to have time unsupervised [at the Sky Zone in Mechanicsburg], she gave the wrong place that she was going to be, not even with the right city, and failed to make sure that [C]hildren were in appropriate safety restraints while traveling by vehicle. That calls into question significant issues with regard to Mother's judgment as an adult, let alone her judgment as a parent.

No adult should allow a child at any time to be in a car at their ages unrestrained, let alone a [m]other, under those circumstances, when she knew that the court would be looking very carefully at the safety of [C]hildren.

* * *

The [c]ourt was somewhat disturbed by Mother's testimony with regard to the twins. She indicated that she like to dress them up, and care for them, as if they were dolls and not children.

Children require parents who go to their school, who go to their doctors appointments, who stay with them when they're sick, who don't listen to music or stick them in front of a TV during . . . an unsupervised visit, and who attend to their safety at all times.

* * *

[I]n this case we have been lucky to have an appropriate Foster Mother, who has had these children since their initial placement, the [C]hildren are in an extremely stable situation with family together, which is the most that the [c]ourt can ask for in any situation. They are clearly loved and cared for in their current setting. Therefore, the [c]ourt will change the goal as it is in the [C]hildren's best interest to do so to adoption with an alternative goal of placement with a fit and willing relative, specifically, [Foster Mother].

N.T., 12/29/17, at 216-221, 225.

Following our review of the record, we conclude that competent evidence in the record supports the trial court's findings of fact and credibility. *See L.Z.*, 111 A.3d at 1174. Specifically, the court was entitled to reject Mother's attempts to blame Foster Mother for the breakdown in their relationship. *See id.* Moreover, the court was entitled to weigh Mother's compliance with the family service plans with her lack of progress in assuming fundamental parental duties over the year and eight months Children have been removed from Mother's care. *See A.K.*, 936 A.2d at 533. Lastly, given the factual findings of the court, we discern no error in the court's determination that it was in the best interests of Children to change the permanency goal to adoption despite the strong bond between Mother and Children. *See K.C.*, 903 A.2d at 14-15. Thus, having discerned no abuse of discretion or error of law in the trial court's ruling, we affirm.

Orders affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 09/11/2018

- 14 -